Opinion by Judge FISHER; Partial Concurrence and Partial Dissent by Judge BERZON.
OPINION
FISHER, Circuit Judge:
The plaintiffs are severely disabled California residents. They alleged that “[c]onventional medical services, drugs and medications” have not alleviated the pain caused by their impairments. Each of them has therefore “obtained a recommendation from a medical doctor” to use marijuana to treat her pain. This medical marijuana use is permissible under California law, see Cal. Health & Safety Code § 11362.5(d) (suspending state-law penalties for marijuana possession and cultivation for seriously ill Californians and their caregivers who “possess[] or cultivate[] marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician”), but prohibited by the federal Controlled Substances Act (CSA), see 21 U.S.C. §§ 812(b)(1)(B), 812(c) sched. I(c)(10), 841(a), 844(a).
The plaintiffs obtain medical marijuana through collectives located in Costa Mesa and Lake Forest, California. These cities, however, have taken steps to close marijuana dispensing facilities operating within their boundaries. Costa Mesa adopted an ordinance excluding medical marijuana dispensaries completely in 2005. See Costa Mesa, Cal., Ordinance 05-11 (July 19, 2005). Some mariguana dispensing facilities, including the Costa Mesa collectives, have apparently continued to operate despite the ordinance, but the plaintiffs alleged that Costa Mesa police have recently “raided operating marijuana collectives and detained collective members.”[1] Lake Forest has also allegedly raided medical marijuana collectives operating within city limits, and has brought a public nuisance action in state court seeking to close them. See City of Lake Forest v. Moen, No. 30-2009-298887 (Orange Cnty.Super.Ct. filed Sept. 1, 2009).
Concerned about the possible shutdown of the collectives they rely on to obtain medical marijuana, the plaintiffs brought *828 this action in federal district court, alleging that the cities’ actions violate Title II of the Americans with Disabilities Act (ADA), which prohibits discrimination in the provision of public services.[2] District Judge Guilford sympathized with the plaintiffs, but denied their application for preliminary injunctive relief on the ground that the ADA does not protect against discrimination on the basis of marijuana use, even medical marijuana use supervised by a doctor in accordance with state law, unless that use is authorized by federal law.
We affirm. We recognize that the plaintiffs are gravely ill, and that their request for ADA relief implicates not only their right to live comfortably, but also their basic human dignity. We also acknowledge that California has embraced marijuana as an effective treatment for individuals like the plaintiffs who face debilitating pain. Congress has made clear, however, that the ADA defines “illegal drug use” by reference to federal, rather than state, law, and federal law does not authorize the plaintiffs’ medical marijuana use. We therefore necessarily conclude that the plaintiffs’ medical marijuana use is not protected by the ADA.[3]
Discussion
Title II of the ADA prohibits public entities from denying the benefit of public services to any “qualified individual with a disability.” 42 U.S.C. § 12132.[4] The plaintiffs alleged that, by interfering with their access to the medical marijuana they use to manage their impairments, Costa Mesa and Lake Forest have effectively prevented them from accessing public ser *829 vices, in violation of Title II. As the district court recognized, however, the ADA also provides that “the term ‘individual with a disability’ does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.” Id. § 12210(a). This case turns on whether the plaintiffs’ medical marijuana use constitutes “illegal use of drugs” under § 12210.[5]
Section 12210(d)(1) defines “illegal use of drugs” as
the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.
Id. § 12210(d)(1). The parties agree that the possession and distribution of marijuana, even for medical purposes, is generally unlawful under the CSA, and thus that medical marijuana use falls within the exclusion set forth in § 12210(d)(l)’s first sentence. They dispute, however, whether medical marijuana use is covered by one of the exceptions in the second sentence of § 12210(d)(1). The plaintiffs contend their medical marijuana use falls within the exception for drug use supervised by a licensed health care professional. They alternatively argue that the exception for drug use “authorized by ... other provisions of Federal law” applies. We consider each argument in turn.
I.
We first decide whether the plaintiffs’ marijuana use falls within § 12210’s supervised use exception.
There are two reasonable interpretations of § 12210(d)(l)’s language excepting from the illegal drug exclusion “use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.” The first interpretation — urged by the plaintiffs — is that this language creates two exceptions to the illegal drug exclusion: (1) an exception for professionally supervised drug use carried out under any legal authority; and (2) an independent exception for drug use authorized by the CSA or other provisions of federal law. The second interpretation — offered by the cities and adopted by the district court — is that the provision contains a single exception covering all uses authorized by the CSA or other provisions of federal law, including both CSA-authorized uses that involve professional supervision (such as use of controlled substances by prescription, as authorized by 21 U.S.C. § 829, and uses of controlled substances in connection with research and experimentation, as authorized by 21 U.S.C. § 823(f)), and other CSA-authorized uses. Under the plaintiffs’ interpretation, their state-sanctioned, doctor-recommended marijuana use is covered under the supervised use exception. Under the cities’ interpretation, the plaintiffs’ state-authorized medical marijuana use is not covered by any exception because it is not authorized by the CSA or another provision of federal law. Although § 12210(d)(l)’s language lacks a plain meaning and its legislative history is not conclusive, we hold, in light of the text and legislative history of the ADA, as well as the relationship between the ADA and the CSA, that the cities’ interpretation is correct.
*830 The meaning of § 12210(d)(1) cannot be discerned from the text alone. Both interpretations of the provision are somewhat problematic. The cities’ reading of the statute renders the first clause in § 12210(d)(l)’s second sentence superfluous; if Congress had intended that the exception cover only uses authorized by the CSA and other provisions of federal law, it could have omitted the “taken under supervision” language altogether. But the plaintiffs’ interpretation also fails to “giv[e] effect to each word” of § 12210(d)(1), United States v. Cabaccang, 382 F.3d 622, 627 (9th Cir.2003) (en banc), for if Congress had really intended that the language excepting “other uses authorized by the Controlled Substances Act or other provisions of Federal law” be entirely independent of the preceding supervised use language, it could have omitted the word “other,” thus excepting “use of a drug taken under supervision by a licensed health care professional, or uses authorized by the Controlled Substances Act.” Moreover, unless the word “other” is omitted, the plaintiffs’ interpretation renders the statutory language outright awkward. One would not naturally describe “the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law” unless the supervised uses were a subset of the uses authorized by the CSA and other provisions of federal law. The plaintiffs’ reading thus results not only in surplusage, but also in semantic dissonance. Cf. Coos Cnty. Bd. of Cnty. Comm’rs v. Kempthome, 531 F.3d 792, 806 (9th Cir.2008) (declining to adopt the plaintiffs “tortured reading of the statute’s plain text”).[6]
The cities’ interpretation also makes the most sense of the contested language when it is viewed in context. See United States v. Havelock, 664 F.3d 1284, 1289 (9th Cir.2012) (en banc) (“Statutory interpretation focuses on ‘the language-itself, the specific context in which that language is used, and the broader context of the statute as a whole.’ ” (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997))). Here, the context reveals Congress’ intent to define “illegal use of drugs” by reference to federal, rather than state, law. Section 12210(d)(1) mentions the CSA by name twice, and § 12210(d)(2) provides that “[t]he term ‘drug’ means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act.” 42 U.S.C. § 12210(d)(2).
We therefore conclude that the cities’ interpretation of the statutory text is the more persuasive, though we agree with the dissent that the text is ultimately inconclusive. We therefore look to legislative history, including related congressional activity.[7]
*831 The legislative history of § 12210(d), like its text, is indeterminate. It is true, as the plaintiffs point out, that Congress rejected an early draft of the “taken under supervision” exception in favor of a broader version. Compare S. 933, 101st Cong. § 512(b) (as passed by the Senate, Sept. 7, 1989) (“The term ‘illegal drugs’ does not mean the use of a controlled substance pursuant to a valid prescription or other uses authorized by the Controlled Substances Act or other provisions of Federal law.” (emphasis added)), with H.R. 2273, 101st Cong. § 510(d)(1) (as passed by the House, May 22, 1990) (“Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.” (emphasis added)), and H.R. Conf. Rep. No. 101-596, at 2 (1990), reprinted in 1990 U.S.C.C.A.N. 565, 566 (explaining that the House version of the illegal drug exclusion was chosen over the Senate version). We are not persuaded, however, that this history compels the plaintiffs’ interpretation of § 12210(d)(1). Although the expansion of the supervised use exception suggests Congress wanted to cover more than just CSA-authorized prescription-based use, it does not demonstrate that the exception was meant to extend beyond the set of uses authorized by the CSA and other provisions of federal law. The CSA does authorize some professionally supervised drug use that is not prescription-based, see 21 U.S.C. § 823(f) (providing for practitioner dispensation of controlled substances in connection with approved research studies), and Congress could have intended simply to expand the supervised use exception to encompass all such uses.
One House Committee Report does include a brief passage that arguably supports the notion that § 12210(d)(l)’s supervised use language and its authorized use language are independent. See H.R.Rep. No. 101-485, pt. 3, at 75 (1990), 1990 U.S.C.C.A.N. 445, 498 (“The term ‘illegal use of drugs’ does not include the use of controlled substances, including experimental drugs, taken under the supervision of a licensed health care professional. It also does not include uses authorized by the Controlled Substances Act or other provisions of federal law.” (emphasis added)). This discussion is of limited persuasive value, however, because it may rest on the unstated assumption — quite plausible at the time — that professionally supervised use of illegal drugs would always be consistent with the CSA. In fact, the experimental drug use listed in the House Committee Report as an example of the sort of use covered by the supervised use exception is itself CSA-authorized. See 21 U.S.C. § 823(f). There is no reason to think that the 1990 Congress that passed the ADA would have anticipated later changes in state law facilitating professional supervision of drug use that federal law does not permit. The first such change came six years later, when California voters passed Proposition 215, now codified as the Compassionate Use Act of 1996. See *832 Gonzales v. Raich, 545 U.S. 1, 5, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005).
Although it is true, as the dissent points out, that use of marijuana for medical purposes “was not unthinkable” in 1990, before, during and after adoption of the ADA there has been a strong and longstanding federal policy against medical marijuana use outside the limits established by federal law itself. See id. at 5-6, 10-14, 125 S.Ct. 2195 (contrasting California’s historical tolerance for medical marijuana with comprehensive federal limits on marijuana possession imposed by Congress in 1970). In 1970, despite marijuana’s known historical use for medical purposes, Congress listed marijuana as a Schedule I drug, designating it as a substance having “a high potential for abuse,” “no currently accepted medical use in treatment in the United States” and “a lack of accepted safety [standards] for use ... under medical supervision.” Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91-513, tit. II, § 202(b)(1), 84 Stat. 1236, 1247 (codified at 21 U.S.C. § 812(b)(1)). In 1989, the Administrator of the Drug Enforcement Agency (DEA) rejected an administrative law judge’s recommendation that marijuana be relisted from Schedule I to Schedule II because of its therapeutic advantages. The Administrator said that “marijuana has not been demonstrated as suitable for use as a medicine.” 54 Fed.Reg. 53,767, 53,768 (Dec. 29, 1989). The DEA once again rejected rescheduling in 1992, reaffirming the absence of accepted medical use of marijuana. See 57 Fed.Reg. 10,499 (Mar. 26, 1992). It did so again in 2001. See 66 Fed.Reg. 20,038 (Apr. 18, 2001). In 1992, the Federal Drug Administration (FDA) closed the Investigational New Drug (IND) Compassionate Access Program, which had begun in 1978 and had allowed a few dozen patients whose serious medical conditions could be relieved only by marijuana to apply for and receive marijuana from the federal government. See Conant v. Walters, 309 F.3d 629, 648 (9th Cir. 2002); Mark Eddy, Cong. Research Serv., RL 33211, Medical Marijuana: Review and Analysis of Federal and State Policies 8 (2010). In 1998, Congress passed the Omnibus Consolidated and Emergency Supplemental Appropriations Act for 1999, Pub.L. No. 105-277, 112 Stat. 2681 (1998). Under the heading “Not Legalizing Marijuana for Medicinal Use,” this provision stated in part, “Congress continues to support the existing Federal legal process for determining the safety and efficacy of drugs and opposes efforts to circumvent this process by legalizing marijuana, and other Schedule I drugs, for medicinal use without valid scientific evidence and the approval of the Food and Drug Administration.” Id. Every year between 1998 and 2009, Congress blocked implementation of a voter-approved initiative allowing for the medical use of marijuana in the District of Columbia. See, e.g., Consolidated Appropriations Act, 2000, Pub.L. No. 106-113, § 167, 113 Stat. 1501, 1530 (1999). Between 2003 and 2007, the House annually, and by large margins, rejected legislation that would have prevented the Justice Department from using appropriated funds to interfere with implementation of medical marijuana laws in the states that approved such use. See Eddy, supra, at 4-5.
Under the plaintiffs’ view, the ADA worked a substantial departure from this accepted federal policy by extending federal protections to federally prohibited, but state-authorized, medical use of marijuana. That would have been an extraordinary departure from policy, and one that we would have expected Congress to take explicitly. Cf. CNA Fin. Co-ip. v. Donovan, 830 F.2d 1132, 1148 (D.C.Cir.1987) (noting that the Supreme Court has “insisted on *833 some clear evidence of congressional intent to work ‘a substantial change in accepted practice’ through [a statutory] revision”). It is unlikely that Congress would have wished to legitimize state-authorized, federally proscribed medical marijuana use without debate, in an ambiguously worded ADA provision.
Moreover, contrary to the dissent’s suggestion, Congress did not need to include medical marijuana use under the ADA’s supervised use exception to ensure that the federal medical marijuana program— the IND Compassionate Access Program — would be covered by § 12210(d)(1). The federal program was presumably authorized by the CSA’s limited experimental research provisions, see 21 U.S.C. § 823(f), and was thus already covered by the portion of § 12210(d)(1) that excepts CSA-authorized uses. The same is true of the “experimental treatment” programs referenced in the Justice Department memorandum that the dissent cites. We do not quarrel with the dissent’s observation that Congress intended the supervised medical use exception to apply to experimental use of controlled substances, including, perhaps, experimental use of marijuana. These experimental uses, however, are authorized by federal law, and subject to a comprehensive federal regulatory regime. We find nothing in the legislative history to suggest that Congress intended to extend ADA protection to state-authorized, but federally prohibited, uses of marijuana falling outside this regulatory framework. There is not one word in the statute or in the legislative history suggesting that Congress sought to exclude from the definition of illegal drug use the use of a controlled substance that was lawful under state law but unlawful and unauthorized under federal law.
The cities’ interpretation not only makes the best sense of the statute’s text and the historical context of its passage, but also is the only interpretation that fully harmonizes the ADA and the CSA. See In re Transom Lines, 58 F.3d 1432, 1440 (9th Cir.1995) (“[W]e must, whenever possible, attempt to reconcile potential conflicts in statutory provisions.”). To conclude that use of marijuana for medical purposes is not an illegal use of drugs under the ADA would undermine the CSA’s clear statement that marijuana is an unlawful controlled substance that has “no currently accepted medical use in treatment in the United States.” 21 U.S.C. § 812(b)(1)(B). As noted, Congress reaffirmed this principle in a 1998 appropriations act, see Pub.L. No. 105-277, div. F., 112 Stat. 2681, 2681-760 (1998) (“It is the sense of Congress that ... marijuana ... [has] not been approved ... to treat any disease or condition.”), and the government has reiterated it in a number of decisions and advisory memoranda, as well as in its amicus brief in this appeal. See Brief for the United States as Amicus Curiae; see also Memorandum from Deputy Att’y Gen. David W. Ogden to Selected U.S. Att’ys, at 1 (Oct. 19, 2009) [hereinafter Ogden Memo] (“Congress has determined that marijuana is a dangerous drug.”); Memorandum from Deputy Att’y Gen. James M. Cole to U.S. Att’ys, at 1 (June 29, 2011) (same); Memorandum from Helen R. Kanovsky, Dep’t of Hous. & Urban Dev., to John Trasviña, Assistant Sec’y for Fair Hous. & Equal Opportunity, et al., at 2 (Jan. 20, 2011) [hereinafter Kanovsky Memo] (stating that marijuana “may not be legally prescribed by a physician for any reason”).[8]
*834 Accordingly, in light of the text, the legislative history, including related congressional activity, and the relationship between the ADA and the CSA, we agree with both district courts that have considered the question, as well as the Department of Housing and Urban Development and the United States as amicus curiae, in concluding that doctor-supervised marijuana use is an illegal use of drugs not covered by the ADA’s supervised use exception. See James v. City of Costa Mesa, No. SACV 10-0402 AG (MLGx), 2010 WL 1848157, at *4 (C.D.Cal. Apr. 30, 2010); Barber v. Gonzales, No. CV-05-0173-EFS, 2005 WL 1607189, at *1 (E.D.Wash. July 1, 2005); Kanovsky Memo at 5 (“Under ... the ADA, whether a given drug or usage is ‘illegal’ is determined exclusively by reference to the CSA.... While ... the ADA contain[s] language providing a physician-supervision exemption to the ‘current illegal drug user’ exclusionary provisions, this exemption does not apply to medical marijuana users.”).[9]
A contrary interpretation of the exception for “use of a drug taken under supervision by a licensed health care professional” would allow a doctor to recommend the use of any controlled substance — including cocaine or heroin — and thereby enable the drug user to avoid the ADA’s illegal drug exclusion. Congress could not have intended to create such a capacious loophole, especially through such an ambiguous provision. Cf Boss v. Ragingwire Telecomms., Inc., 42 Cal.4th 920, 70 Cal.Rptr.3d 382, 174 P.3d 200, 207 (2008) (observing, in interpreting California’s employment discrimination law, that “given the controversy that would inevitably have attended a legislative proposal to require employers to accommodate marijuana use, we do not believe that [the relevant statute] can reasonably be understood as adopting such a requirement silently and without debate”).[10]
We recognize that the federal government’s views on the wisdom of restricting medical marijuana use may be evolving. See Ogden Memo at 1-2 (advising against using federal resources to investigate and prosecute “individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana”). But for now Congress has determined that, for purposes of federal law, marijuana is unacceptable for medical use. See 21 U.S.C. § 812(b)(1)(B). We decline to construe an ambiguous provision in the ADA as a tacit qualifier of the *835 clear position expressed in the CSA. Accordingly, we hold that federally prohibited medical marijuana use does not fall within § 12210(d)(1)’s supervised use exception.
II.
The plaintiffs contend that even if their marijuana use does not fall within the § 12210(d)(1) exception for “use of a drug taken under supervision by a licensed health care professional,” it nonetheless comes within the separate exception for drug use “authorized by ... other provisions of Federal law,” by virtue of recent congressional action allowing the implementation of a Washington, D.C. medical marijuana initiative. We reject this argument.
D.C.’s Initiative 59 suspended local criminal penalties for seriously ill individuals who use medical marijuana with a doctor’s recommendation. See D.C. Act 13-138, §§ 2 & 3 (Sept. 20, 1999) (providing that such individuals do not violate the District of Columbia Uniform Controlled Substances Act). Although D.C. voters passed this initiative in 1998, Congress blocked its implementation through an appropriations provision known as the Barr Amendment, as noted earlier. See Consolidated Appropriations Act of 2000, Pub.L. No. 106-113, § 167(b), 113 Stat. 1501, 1530 (1999) (“Initiative 59 ... shall not take effect.”); Comment, Seeking a Second Opinion: How to Cure Maryland’s Medical Marijuana Law, 40 U. Balt. L.Rev. 139, 149 n. 61 (2010) (describing the history of the Barr Amendment). Congress reenacted the Barr Amendment every year thereafter until 2009, when it passed an appropriations bill without the Barr Amendment language. See Consolidated Appropriations Act of 2010, Pub.L. No. 111-117, 123 Stat. 334 (2009). Soon afterward, the D.C. Council approved implementation of Initiative 59, see D.C. Act 18-210 (June 4, 2010), and Congress did not pass any joint resolution of disapproval, thus allowing the initiative to take effect. See Marijuana Policy Project v. United States, 304 F.3d 82, 83 (D.C.Cir.2002) (“D.C. Council enactments become law only if Congress declines to pass a joint resolution of disapproval within thirty days.”).
The plaintiffs argue that these congressional actions amount to “other provisions of Federal law” that authorize their medical marijuana use under § 12210(d)(1). We disagree. By allowing Initiative 59 to take effect, Congress merely declined to stand in the way of D.C.’s efforts to suspend local penalties on medical marijuana use. It did not affirmatively authorize medical marijuana use for purposes oí federal law, which continues unambiguously to prohibit such use.[11] See Webster’s Third New International Dictionary 147 (2002) (“Authorize indicates endowing formally with a power or right to act.”). *836 Moreover, even if Congress’ actions somehow implicitly authorized medical marijuana use in the District of Columbia, Congress in no way authorized the plaintiffs’ medical marijuana use in California. Congress’ actions therefore did not bring the plaintiffs’ marijuana use within the § 12210(d)(1) exception.
We also do not agree with the plaintiffs that “[ejqual protection ... mandates” a different conclusion. Congress’ decision not to block implementation of Initiative 59 did not result in the unequal treatment of District of Columbia and California residents. On the contrary, Congress’ actions allow these jurisdictions to determine for themselves whether to suspend their local prohibitions on the use and distribution of marijuana for medical purposes. Local decriminalization notwithstanding, the unambiguous federal prohibitions on medical marijuana use set forth in the CSA continue to apply equally in both jurisdictions, as does the ADA’s illegal drug exclusion. There is no unequal treatment, and thus no equal protection violation. See Boos v. Barry, 485 U.S. 312, 333, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (remarking that a statute could only run afoul of the Equal Protection Clause if construed to generate unequal treatment).
We therefore reject the plaintiffs’ argument that their use of medical marijuana was authorized by Congress when it allowed implementation of D.C.’s Initiative 59.
Conclusion
We hold that doctor-recommended marijuana use permitted by state law, but prohibited by federal law, is an illegal use of drugs for purposes of the. AD A, and that the plaintiffs’ federally proscribed medical marijuana use therefore brings them within the ADA’s illegal drug exclusion. This conclusion is not altered by recent congressional actions allowing the implementation of the District of Columbia’s local medical marijuana initiative. The district court properly concluded that the plaintiffs’ ADA challenge to the cities’ efforts to close their medical marijuana collectives is unlikely to succeed on the merits. The district court therefore did not abuse its discretion by denying preliminary injunctive relief. See Farris v. Seabrook, 677 F.3d 858, 863-65 (9th Cir.2012) (describing the legal standard applicable to preliminary injunctive relief and the standard of review on appeal).[12]
The parties shall bear their own costs on appeal.
AFFIRMED.

. We assume, as the parties do, that Costa Mesa’s efforts to close medical marijuana "dispensaries" include the marijuana dispensing facilities that serve the plaintiffs, which the complaint terms "collectives.” Compl. ¶¶ 6, 10-11.

. The complaint alleged that "[e]ach of the plaintiffs is a qualified person with a disability as defined in the ADA.” Comply 4. It further alleged that each of the defendant cities is covered by Title II, under which public entities "must not intentionally or on a disparate impact basis discriminate against the disabled individual's meaningful access to public services.” Id. ¶ 20. The complaint sought an order requiring the cities to "cease and desist any further action to remove existing marijuana collectives organized under the laws of California,” as well as to establish regulations "that will accommodate the needs of qualified persons under the ADA so as to be able to legally access marijuana under California law.” Id. at 5-6.

. We do not hold, as the dissent states, that "medical marijuana users are not protected by the ADA in any circumstance.” We hold instead that the ADA does not protect medical marijuana users who claim to face discrimination on the basis of their marijuana use. See 42 U.S.C. § 12210(a) (the illegal drug use exclusion applies only "when the covered entity acts on the basis of such use”). As the Equal Employment Opportunity Commission has explained,
A person who alleges disability based on one of the excluded conditions [such as current use of illegal drugs or compulsive gambling, see 42 U.S.C. § 12211(b)(2),] is not an individual with a disability under the ADA. Note, however, that a person who has one of these conditions is an individual with a disability if (s)he has another condition that rises to the level of a disability. See House Education and Labor Report at 142. Thus, a compulsive gambler who has a heart impairment that substantially limits his/her major life activities is an individual with a disability. Although compulsive gambling is not a disability, the individual’s heart impairment is a disability.
U.S. Equal Emp't Opportunity Comm’n, Section 902 Definition of the Term Disability, at § 902.6 (last modified No. 21, 2009), available at http://www.eeoc.gov/policy/docs/902 cm.hlml (last visited Apr. 27, 2012).

.Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132. A "public entity” includes "any State or local government,” id. § 12131(1)(A), and there is no dispute that the defendant cities are public entities for purposes of Title II.

. The cities do not dispute that they have acted "on the basis of" the plaintiffs' marijuana use by restricting the operation of the medical marijuana collectives on which the plaintiffs rely.

. Unlike our dissenting colleague, we do not place great significance on the use of a comma to separate supervised uses from other uses authorized by the CSA and other federal laws. We very much doubt Congress would have relied on a single comma to acknowledge the legitimacy of a highly controversial medical practice. Cf. Crandon v. United Stales, 494 U.S. 152, 169, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring) (remarking, in discounting the significance of a misplaced comma, that "the evidence ... should be fairly clear before one concludes that Congress has slipped in an additional requirement in such an unusual fashion”).

. " 'If the statutory language is unambiguous and the statutory scheme is coherent and consistent,' judicial inquiry must cease.” Miranda v. Anchondo, 684 F.3d 844, 849 (9th Cir.2012) (quoting In re Feirell, 539 F.3d 1186, 1190 n. 10 (9th Cir.2008)). If the statute is ambiguous, however, "we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent.” Probert v. Family Cen *831 tered Servs. of Alaska, Inc., 651 F.3d 1007, 1011 (9th Cir.2011) (quoting Ileto v. Glock, Inc., 565 F.3d 1126, 1133 (9th Cir.2009)) (internal quotation marks omitted). “We may also look to other related statutes because ‘statutes dealing with similar subjects should be interpreted harmoniously.’ ” Tides v. Boeing Co., 644 F.3d 809, 814 (9th Cir.2011) (quoting United States v. Nader, 542 F.3d 713, 717 (9th Cir.2008)); see also Tidewater Oil Co. v. United States, 409 U.S. 151, 157-58, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972) (stating that “it is essential that we place the words of a statute in their proper context by resort to the legislative history,” including related congressional activity addressing the same subject matter).

. Before oral argument, we invited the view of the United States as amicus curiae. The government accepted our invitation and filed an amicus brief supporting the cities' interpretation:
*834 The proper interpretation of the term "illegal use of drugs,” as defined in 42 U.S.C. [§ ] 12210(d), includes the use of marijuana taken under doctor supervision, unless that use is authorized by the CSA or another federal law, which is not the case here. Federal law makes clear that medical marijuana use does not receive special protection under the ADA.
Brief for the United States as Amicus Curiae at 10.

. We do not, as the dissent suggests, resolve the statutory ambiguity based on an imagined inconsistency between the express terms of the ADA and "general considerations of supposed public interests” derived from the CSA. United Paperworkers Int’l Union v. Misco, 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (quoting W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)) (internal quotation marks omitted). The CSA directly addresses whether medical marijuana use constitutes illegal use of drugs, and clearly states that such use is unlawful.

. The dissent dismisses this problem, arguing that state licensing requirements are sufficient to limit the reach of the supervised use exception. State licensing requirements do not eliminate the potential absurdity, however. A doctor who recommends the use of an illegal drug might still succeed in preserving ADA protection for the drug user, even if the doctor's behavior might ultimately result in discipline before the state licensing authority.

. It is true, of course, that, because the District of Columbia is not sovereign, the D.C. Council’s legislative power is derived from that of Congress. See U.S. Const, art. 1, § 8, cl. 17 ("Congress shall have Power ... [t]o exercise exclusive Legislation in all Cases whatsoever, over ... the Seat of the Government of the United States.”); D.C.Code Ann. §§ 1-203.02, 1-204.04 (delegating some of Congress' legislative power to the District and enumerating the powers of the D.C. Council). But "[u]nlike most congressional enactments, the [D.C.] Code is a comprehensive set of laws equivalent to those enacted by state and local governments.” Key v. Doyle, 434 U.S. 59, 68 n. 13, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977). D.C. Council enactments are therefore not "federal” laws in the usual sense. See United States v. Weathers, 493 F.3d 229, 236 (D.C.Cir.2007) (distinguishing between counts charged "under federal law” and "under the D.C. Code”); Foretich v. United States, 351 F.3d 1198, 1205 (D.C.Cir.2003) (referring to "criminal liability under both D.C. and federal law”).

. Because we conclude that the plaintiffs are not qualified individuals with a disability protected by the ADA, we do not reach Costa Mesa’s alternative argument that the ADA does not require accommodation of a qualified individual's "misconduct.” Likewise, because we conclude that the district court properly denied preliminary injunctive relief, we need not decide whether the Anti-Injunction Act would prohibit the court from enjoining Lake Forest from pursuing its state-court public nuisance action.